UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WESTERN DIVISION     C.A. No. 04CV30241-MAP

MICHAEL F. ERALI,

    Plaintiff,

v.     DEFENDANT TOWN OF
ORANGE'S LOCAL RULE 56.1
STATEMENT OF FACTS

TOWN OF ORANGE,

    Defendant

    The defendant, Town of Orange (the "Town"), submits this Statement of Facts pursuant to Local Rule 56.1 in support of its Motion for Summary Judgment on the Complaint filed by the plaintiff, which alleges that the Town unlawfully discriminated against the plaintiff on the basis of sex by sexually harassing the plaintiff and retaliating against the plaintiff for opposing the Town's alleged discriminatory practices in violation of Title VII of the 1964 Civil Rights Act and M.G.L. c. 151B.

1.    Michael F. Erali, II ("Erali") is the plaintiff in this matter. (Complaint, generally) Erali began his employment as a part-time laborer for the Town's Cemetery Department on or about September 24, 2001. As of July 1, 2002, Erali became a full-time laborer for the Cemetery Department. (Exhibit A, Deposition of Michael Erali, pp. 12-13, hereinafter "Ex. A, Erali, p. __")

2.    The Town is a municipal corporation located in central Massachusetts, with a principal place of business at 6 Prospect Street in Orange, Massachusetts. (Complaint, generally)

3.    The Town's Cemetery Commission is a three-member elected board that oversees the Town's Cemetery Department. At all times relevant to this case, Daniel Kimball ("Kimball")

was the Chairman of the Cemetery Commission. Kimball is also employed as a police officer for the Towns of Orange, Phillipston, and Warwick. (Exhibit B, Deposition of Daniel Kimball, pp. 7-11, hereinafter "Ex. B, Kimball, p. __")

4. The Cemetery Superintendent manages the daily operations of the Cemetery Department. On November 4, 2002, Evelyn Daly ("Daly") was selected by the Cemetery Commission to replace Thomas Forest ("Forest"), who was retiring from the position of the Cemetery Superintendent as of December 31, 2002. (Ex. B, Kimball, pp. 124-125) (Exhibit C, Deposition of Evelyn Daly, pp. 36-38. hereinafter "Ex. C, Daly, p. __")

5. Forest was the Cemetery Superintendent for approximately thirty years before retiring at the end of December, 2002. After his retirement, Forest continued to work for the Cemetery Department as a part-time consultant, working ten hours per week, from January 1, 2003 to June 30, 2003. (Exhibit D, Deposition of Thomas Forest, pp. 7-9, hereinafter "Ex. D, Forest, p. __")

6. Gerry Donadio ("Donadio"), Shane Doucette ("Doucette"), and Todd Fellows ("Fellows") were part-time or temporary employees, who worked as laborers for the Cemetery Department at the same time as Erali. Occasionally, the Cemetery Department employed other laborers, who were hired on an as-needed basis. From November 4, 2002 through April 22, 2003, Erali and Daly were the only permanent full-time employees of the Cemetery Department. (Ex. A, Erali, pp. 15-16; Ex. C, Daly, pp. 37-38)

7. Erali and the other laborers were required to punch a time card at the beginning and end of each shift. (Ex. A., Erali, p. 18; Ex. C, Daly, p. 52)

8. The workday of the Cemetery Department begins at 7 a.m., with all employees reporting to the Cemetery shop to receive the daily work assignments before being dispatched to the seven cemeteries throughout the Town. (Ex. A, Erali, pp. 17-20, 25)

9. Throughout his employment with the Cemetery Department, Erali was frequently out sick or late for work. As his timecards and sick leave affidavits reflect, Erali was out sick on at least fifteen occasions from July 1, 2002 to April 19, 2003. (Ex. A, Erali, p. 100; Ex. C, Daly, pp. 155, 199; Ex. E, Affidavit of Evelyn Daly) For the period of July 1, 2002 through April 22, 2003, Erali's timecards reflect that he was more than five minutes late for work on 54 days, more than ten minutes late for work on 30 days, and at least fifteen minutes late for work on 20 days. (Ex. E, Daly Affidavit)

10. On May 8, 2002, Forest issued a written warning to Erali for being tardy on seven days. (Ex. A, Erali, p. 106 and Deposition Ex. 7 ) Daly also gave Erali verbal warnings regarding his tardiness and noted his tardiness on his timecards. (Ex. C, Daly, pp. 124-126, 207)

11. On December 11, 2002, Erali walked off the job and remained out of work for two and one-half days. (Ex. A, Erali, pp. 90-93;Ex. C, Daly, pp. 202-203) After speaking with Forest, Erali came back to work. (Ex. D, Forest, pp. 42-45; Ex. C, Daly, pp. 150-151)

12. On days that Erali did not report to work, Daly would make arrangements for other part-time laborers to cover for Erali, provided she had sufficient funds in the department's budget to pay for the part-time help. (Ex. C, Daly, pp. 128, 200- 201)

13. On several occasions, Daly called Erali at his house or at other telephone numbers that Erali had provided her to find out if he was coming to work. (Ex. C, Daly, pp. 128-129, 199)

14. On Saturday, April 19, 2003, Erali and Daly worked alone together for a funeral. (Ex. C, Daly, pp. 137-138; Ex. E, Daly Affidavit, Attachment 1)

15. On Monday, April 21, 2003, Erali did not report or call in to work, so Daly called Erali at his house, where he lived with his girlfriend, Aleesha Watson ("Watson"). After Watson advised Daly that Erali was at his mother's house, Daly called Erali at his mother's house, but no one

answered the phone. Within ten minutes of Daly's phone call to Erali's mother's house, Erali called Daly and advised her that he would be at work as soon as he retrieved some clothes, but Erali never showed up for work that day. Daly called Erali a few more times, but never spoke with Erali again that day. (Ex. C, Daly, p. 140-143; Ex. F, Watson, pp. 34-35)

16.     Also on Monday, April 21, 2003, a school department employee, Barbara Marsh ("Marsh"), was hired as a temporary employee for the Cemetery Department for the week. On that morning, Marsh was engaged in conversation outside Daly's office at the beginning of the workday. Doucette and Daly heard Marsh make a derogatory comment about Watson and her son. (Ex. C, Daly, pp. 173-176)

17.     Prior to the start of the workday on or about the morning of April 22, 2003, Doucette told Erali what Marsh had said about his girlfriend and child. Doucette and Erali left work and drove to Watson's house for Doucette to relay the conversation. Thereafter, Erali and Watson went to Forest's house to report their complaints.    (Ex. A, Erali, pp. 55-59)

18.     On three occasions, Erali complained to Forest about Daly:

    a.     The first time, sometime in December 2002, Erali spoke with Forest while sitting under a bridge and complained to Forest about Daly's phone calls to his house. At Forest's suggestion, Erali told Daly that her phone calls were waking everybody up in his house and asked her not to call unless it was an emergency, and Daly agreed. Forest also persuaded Erali to return to work, as Erali had walked off the job after being asked to do some tasks that he felt were menial. (Ex. A, Erali, pp. 51-52; Ex. D, Forest, pp. 26-29, 36-37, 41-44)

    b.     The second time, in the spring of 2003, Erali spoke with Forest at Holtshire Cemetery, and Erali reported an incident where Erali, Fellows, and Daly were discussing the need for a loam delivery from the Highway Department, and Daly said, "I give him a blow job

4

and I get what I want." Erali also told Forest that Daly's phone calls to his house had not stopped and that Watson was under the impression that there was a sexual relationship between Erali and Daly. (Ex. A, Erali, pp. 46-47, 51, 53-55; Ex. D, Forest, pp. 50-51, 55, 58-59)

   c. The third time that Erali spoke with Forest was in April, 2003, shortly before Erali stopped working for the Town, when Erali and Watson drove to Forest's house to complain about Marsh's comment regarding Watson and her children. Watson also complained to Forest about Daly's frequent calls to Erali, which she believed were of a personal nature. Forest referred Erali to Cemetery Commission Chairman Kimball. (Ex. A, Erali, pp. 55-57; Ex. D, Forest, pp. 76-79, 96-97)

19. On April 21, 2003, Forest called Kimball and advised that Erali and Watson had complained about Daly calling Erali at home and that some of the calls were of a personal nature. Forest also told Kimball that Watson complained about a comment Daly made about Erali, claiming that Daly had Erali all day while Watson had him all night. Kimball told Forest that Watson could call him at home if she wanted to discuss the matter further. (Ex. B, Kimball, pp. 66-68)

20. On the evening of April 21, 2003, around 7 p.m., Watson called Kimball at home and told him that throughout that day, Daly had called Erali at his mother's house, where he was staying, and that the calls were of a harassing nature. Watson also told Kimball that Daly had called Erali at home once to tell him that someone they knew was in the paper and that Daly had called Erali cute and said he could live with her. Watson told Kimball that she wanted the phone calls to stop and for Daly to only call for work-related reasons. Kimball told Watson that he wanted to speak with Erali personally. (Ex. B, Kimball, pp. 72-73)

5

21.     At approximately 9 p.m. on April 21, 2003, Erali called Kimball at home and told him that the Cemetery Department telephone number had appeared on the caller ID box at his mother's house throughout the day.  Erali told Kimball that Daly had said some rude things to him and that he was afraid to be alone with Daly.   Erali also told Kimball that Daly put her arm around him once in front of Watson.  Erali told Kimball that he wanted Daly to stop calling his house and that he wanted Daly to stop hugging him or touching him in an affectionate manner.  Kimball told Erali that he would speak to Daly the next day.  Kimball told Erali that he would meet him at work the next day to further discuss the matter.  (Ex. B, Kimball, pp. 74-78, 89 and Deposition Ex. 5)

22.     Around 9 a.m. on April 22, 2003, Kimball went to the Cemetery shop to meet with Erali, but Erali was not at work.  With Forest present, Kimball spoke with Daly regarding Erali's complaints about the number of telephone calls Daly made to Erali and told Daly that Erali did not want her to touch him in an affectionate manner.  Kimball also told Daly about Watson's complaint that Daly had said Erali was cute and could live with her and that Daly had Erali all day while Watson had him all night.  Daly denied making these comments and agreed to maintain a professional relationship with Erali.  (Ex. B, Kimball, pp. 80-82 and Deposition Ex. 5)

23.     After his discussion with Daly, Kimball spoke with Erali on the telephone from the Cemetery shop and advised him of his discussion with Daly.  Erali told Kimball that he had left work earlier that morning without any explanation after he learned of the comment made by Marsh regarding Watson.  Kimball told Erali that he would address the Marsh issue, but Erali said he had already spoken with the school principal about it.  Kimball told Erali that he would

6

have to talk with Daly about the fact that he had punched in and left work that morning. (Ex. B, Kimball, pp. 83-85 and Deposition Exhibit 5)

24. When Kimball was finished speaking with Erali, he handed the phone to Daly, who spoke with Erali from her office at the Cemetery shop, with her office door open. Meanwhile, Kimball remained in the shop, approximately 10-12 feet from where Daly was speaking with Erali. Kimball overheard some of Daly's phone conversation with Erali. (Ex.B, Kimball, pp. 85-88)

25. Later that day, Erali came to the Cemetery shop, where he turned in his keys and advised Daly that he was quitting. (Ex. C, Daly, p. 168)

26. The Town has adopted a Sexual Harassment Policy and investigation procedures, which Erali acknowledged receiving, yet Erali never filed a formal complaint against Daly. (Ex. A, Erali, pp. 95-98 and Deposition Exs. 4 and 5)

27. Erali's allegations of sexual harassment consist of the following:

    a. Fifty to sixty phone calls made by Daly to Erali's house, his parent's house, his father's business, and to Watson's mother's house between November 4, 2002 and April 22, 2003 (Ex. A, Erali, pp. 24-29, 40);

    b. Daly putting her arm on Erali's shoulders one time in front of Watson (Ex. A, Erali, pp. 60-61);

    c. Daly commenting to Erali and Fellows that if she gave someone at the Highway Department oral sex, she would get loam delivered (Ex. A, Erali, pp. 46-50);

7

       d.      Daly's act of shutting the door to the Cemetery break room behind her upon Watson's arrival, which gave Watson the impression that Daly and Erali were fooling around because Erali was alone with Daly in the break room (Ex. A, Erali, pp. 62-64);

       e.      Daly's comment to Watson that she had Erali all day while Watson had him all night (Ex. A, Erali, pp. 77-79); and

       f.      Daly's comment to Watson that she had Erali working on his knees. (Ex. A, Erali, pp. 77-79)

28.     Of the fifty to sixty personal phone calls that Daly made to Erali, he could only recall three specific conversations:

       a.      On one occasion, Daly called to advise Erali that she had read in the newspaper that a former Cemetery employee, whom Erali knew, was being deployed for military duty in Iraq (Ex. A, Erali, pp. 25, 41; Ex. C, Daly, p. 77);

       b.      Daly called Erali once to ask him about a brush fire at one of the cemeteries (Ex. A, Erali, pp. 24, 27); and

       c.      On April 21, 2003, Daly called to ask Erali if he and Watson were fighting (Ex. A, Erali, pp. 30, 34, 38; Ex. C, Daly, pp. 140-143).

29.     Daly acknowledged that she put her arm on Erali's shoulders one time in Watson's presence. (Ex. C, Daly, p. 114)

30.     In the wintertime, the door to the Cemetery Department break room was kept closed to keep the heat in the room and to save on heating costs. (Ex. C, Daly, p. 59)

31.     Erali told Forest and Daly on more than one occasion that he was upset that Forest was leaving as the Superintendent of the Cemetery Department. (Ex. C, Daly, p. 166; Ex. D, Forest, pp. 23-24, 40, 55)

32.     Erali chatted with Daly and shared personal information, including his concerns regarding a house he had purchased with Watson in Athol that they had to abandon due to a mold problem that affected his baby's health, his financial stress resulting from those house problems, the fact that he and his girlfriend moved into a new apartment, when his child was sick and when he argued with Watson. Erali invited Forest and Daly over to see his new apartment and Daly visited once for a brief tour. (Ex. C, Daly, pp. 55-58)

33.     Daly called Erali every time he was late or out of work, which averaged 3-5 times per week. (Ex. C, Daly, pp. 129-130, 199)

34.     Erali acknowledged that he did not always answer the phone when Daly would call him and that often no one at his house or his mother's house would answer the phone if the telephone number for the Town of Orange or for Daly appeared on the caller ID box. (Ex. A, Erali, pp. 26, 31-32, 36-37, 43)

35.     Erali and Watson did not have an answering machine for some of the time that Erali worked for the Town. Watson acknowledged that there were times when no one answered the phone when the Town of Orange or Daly's telephone numbers appeared on the caller ID box. When Daly's calls to Erali's house were answered, it was usually Watson who answered the phone. On several occasions, Watson told Daly that Erali was sleeping to end the conversation. When Daly called Erali's house on the morning of April 21, 2003, Watson answered the phone

9

and lied to Daly and told her that Erali was at his mother's house, so Daly would stop calling. (Ex. F, Deposition of Aleesha Watson Erali, pp.19-26, 36)

36. Erali was promoted twice while he worked for the Cemetery Department, once in the winter of 2001 and again in July 2002, and prior to leaving the Cemetery Department he was expecting another promotion and raise after successfully obtaining his hoister's license. (Complaint, ¶¶ 14, 15, 33; Ex. A, Erali, pp. 12-13; Ex. C, Daly p. 58)

>DEFENDANT,
>
>TOWN OF ORANGE,
>By its attorneys,
>
> /s/ David C. Jenkins
>David C. Jenkins (BBO# 251000)
>Carolyn M. Murray (BBO# 653873)
>Kopelman and Paige, P.C.
>101 Arch Street, 12th Floor
>Boston, MA 02110
>(617) 556-0007

Dated: February 28, 2006

274636/60700/0538

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WESTERN DIVISION                          C.A. No. 04CV30241-MAP

| | |
|---|---|
| MICHAEL F. ERALI,<br><br>    Plaintiff,<br><br>v.<br><br>TOWN OF ORANGE,<br><br>    Defendant | DEFENDANT TOWN OF ORANGE'S LOCAL RULE 56.1 STATEMENT OF FACTS EXHIBITS A-F |

Exhibits A-F to the Defendant Town of Orange's Local Rule 56.1 Statement of Facts will be sent by first class mail under separate cover to the court.

DEFENDANT,

TOWN OF ORANGE,

By its attorneys,

   /s/ David C. Jenkins
David C. Jenkins (BBO# 251000)
Carolyn M. Murray (BBO# 653873)
Kopelman and Paige, P.C.
101 Arch Street, 12th Floor
Boston, MA 02110
(617) 556-0007

Date: February 28, 2006

275303/METG/0538