UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
:
MICHAEL ERALI II                              :
:
                    Plaintiff,              :         DOCKET NO.  3:04-cv-30241-MAP
:
v.                                            :
:
TOWN OF ORANGE,                               :
:
                    Defendant.            :
_____:

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The plaintiff, Michael Erali II, contends that he was harassed by his female supervisor and that his employer did not stop the harassment despite his repeated complaints to management.  The conduct upon which his claim rests is as follows:[1]

- His female boss' comments to Mr. Erali and a co-worker that she gives blow jobs to "get what she wants"  and that she would give blow jobs in exchange for loam (SODF ¶ 31, 32)

- His female boss attempting to kiss Mr. Erali (SODF ¶ 29)

- His female boss hugging and kissing other male employees (SODF ¶ 28)

- His female boss coming up from behind him and in the presence of his fiancée throwing both her arms around Mr. Erali (SODF ¶ 36)

- His female boss leaving the workplace and coming back dressed like Mr. Erali's fiancée, wearing shorts and a tank top (SODF ¶ 35, 37)

_____

[1] All citations are to the Plaintiff's Statement of Facts Pursuant to Local Rule 56.1 as to Which There Exists a Genuine Dispute to be Tried, filed on this date and will be referred to as "SODF ¶ ___" when citing to paragraphs contained within that Statement of Facts in this Memorandum of Law.

- His female boss, feigning that she and Mr. Erali were involved in sexual activity when his fiancée came to visit him (SODF ¶ 38)

- His female boss saying things to Mr. Erali about his working with his shirt off that made him so uncomfortable he stopped doing so (SODF ¶ 41)

- His female boss wearing a pocket watch on the front of her belt and if male coworkers asked her what time it was, she'd lift up her shirt, push out her pelvis and say "you tell me" (SODF ¶ 42)

- His female boss writing "Mikey" or "Li'l Tike" on his timecard  (SODF ¶ 45)

- His female boss telling Mr. Erali's fiancée that she "has" him all day and that his fiancée "has" him all night and that all he does is sleep for his fiancée (SODF ¶ 40)

-  His female boss telling his fiancée that she has Mr. Erali working on his knees, following with something to the effect of – "you know what I mean – on his knees"   (SODF ¶ 43)

- His female boss telling Mr. Erali's fiancée that he could come live with her

- His female boss calling Mr. Erali a total of 80 times in 5 months including calls to his home, his mother's home, his fiancée's mother's home and his father's business, 20 of those calls coming on one day alone   (SODF ¶ 51, 57, 59)

- His female boss incessantly calling Mr. Erali on non-work hours, before work, after work, on weekends, including Sunday mornings and only one (1) of those calls was arguably work-related, others calls were

inquiries about his relationship with his fiancée and flirtatious comments
(SODF ¶¶ 46-60)

In his Complaint, plaintiff Michael Erali II asserts claims of gender-based discrimination in violation of Title VII of the 1964 Civil Rights Act and the Massachusetts laws against discrimination. Mr. Erali contends that during the course of his employment as a laborer in the Cemetery Department with the Town of Orange (the "Town"), he was subjected to a hostile work environment and sexual harassment in violation of 42 U.S.C. § 2000e-2(a)(1) and M.G.L. c. 151B, §§ 4(1), 4(4A) and 4(16A). Mr. Erali also contends that Defendant retaliated against him in response to his complaints about sexual harassment in violation of 42 U.S.C. § 2000e-3 and M.G.L. c. 151B, § 4(4); and that the cumulative effect of the Defendant's discriminatory conduct resulted in his constructive discharge from his employment with the Town.

The Defendant has moved for summary judgment on all claims asserted by Mr. Erali in his Complaint. For the reasons set forth below, the Defendant is not entitled to an award of summary judgment.

## I.    SUMMARY JUDGMENT STANDARD IN DISCRIMINATION CASES

Under the Federal Rules of Civil Procedure, summary judgment is appropriate only when all the relevant pleadings and supporting documents, viewed in a light most favorable to the non-moving party, present no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995). All reasonable inferences which may be drawn from the record before the court are to be indulged in

favor of the nonmoving party. Oliver v. Digital Equipment Corp., 846 F.2d 103, 105 (1st Cir. 1988).

The movant bears the initial burden of proving that no genuine issues of material fact exist for trial. Sands v. Ridefilm Corp., 212 F.3d 657, 661 (1st Cir. 2000). See, Celotex Corp. v. Catrett, 477 U.S. 317, 323 -324 (1986). The First Circuit has defined a "genuine issue of material fact" as that which "might affect the outcome of the suit under the governing law." In deciding a motion for summary judgment, "the court must ask 'whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.'" Lipsett v. University of Puerto Rico, 864 F.2d 881, 894 (1st Cir. 1988), quoting, Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 252, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986) (internal quotations omitted). In other words, "[a]n issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Oliver, 846 F.2d at 105 (citations omitted).

In general, summary judgment is an inappropriate tool for resolving claims of employment discrimination. Discrimination cases often involve issues of motivation and intent which can only be proved through reliance on circumstantial evidence. Such determinations regarding motivation and intent depend on complicated inferences from the evidence and are therefore peculiarly within the province of the jury. See eg., LeBlanc v. Great American Ins. Co., 6 F.3d 836, 840 (1st Cir. 1993), cert. denied, 128 L. Ed. 2d 72, 114 S. Ct. 1398 (1994); Waltman v. International Paper Co., 875 F.2d 468 (5th Cir. 1989). Thus, courts should exercise particular caution before granting summary judgment for employers on such issues of pretext, motive and intent. Santiago-Ramos v. Centennial P,R, Wireless Corp., 217 F. 3d 46, 54 (1st Cir. 2000). The reason for this caution is "because of the availability of

seemingly neutral rationales under which an employer can hide its discriminatory intent." Hodgens v. General Dynamics Corp., 144 F.2d 151, 167 (1st Cir. 1998).

## II.    LEGAL ARGUMENT

### A.    THE RECORD AMPLY SHOWS THAT MR. ERALI WAS SUBJECT TO A HOSTILE WORK ENVIRONMENT DUE TO HIS GENDER.

Under Title VII, a hostile work environment is one form of disparate treatment on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).[2] Whereas other disparate treatment claims may scrutinize discrete harms such as hiring or discharge, a hostile work environment claim analyses a workplace environment as a whole to discover whether it is "abusive." Harris v. Forklift Systems, Inc., 510 U.S. 17, 22, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993); see also, Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986). The First Circuit has summarized the factors which must be considered in determining whether a plaintiff has a viable hostile work environment claim under applicable Supreme Court standards: (1) whether she (or he) is a member of a protected class; (2) whether he was subjected to unwelcome sexual harassment; (3) whether the harassment was based upon sex; (4) whether the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) whether sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) whether some basis for employer liability has been established. O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001).

---

[2] Other than a few differences that will be highlighted below, the parties generally seem to agree that the state and federal claims are analyzed under coterminous legal standards.

The Defendant does not appear to dispute that the first two factors are satisfied in this case. Its motion is focused on the latter four factors which will be addressed in turn.

**1.    Harassing behavior and obsessive phone calling which amounted to stalking Mr. Erali by his female supervisor during the course of his employment were "because of sex".**

There can be little dispute based on this record that the harassment suffered by Mr. Erali at the hands of his female supervisor was gender motivated.  The defendant meekly attempts to argue that Mr. Erali's claims of discrimination are motivated by his fiancée (now wife's) jealousy of Mr. Erali's female supervisor and/or Mr. Erali's disappointment that Mr. Forest was retiring.  While it is unclear what Mr. Erali's thoughts or motivations have to do with anything, the citations supplied by the defendant and a review of the complete record do not support either of these claims by the defendant and instead support a hostile environment infused with impermissible gender animus.

The record is replete with evidence that Mr. Erali was unrelentingly harassed by his female supervisor because of his sex.[3]  Behavior that is "because of sex" can be based on "conduct other than explicit sexual advances." Ruffino v. State Street Bank and Trust Co.,  908 F. Supp. 1019, 1036 (D. Mass. 1995) (citing Burns v. McGregor Electronic Industries, Inc., 989 F.2d 959, 964 (8th Cir.1992) (internal citations omitted)).  The law recognizes that conduct in the workplace based on innuendo, stereotyping and other remarks or conduct, is sufficient to show that the offending behavior is "because of sex." See id.

---

[3] Possibly the most significant difference here between the state and federal standard for a hostile work environment claim is that, for a state claim, if it is found that the plaintiff presents sufficient evidence that he was subjected to a sexually or gender hostile work environment the defendant will be strictly liable for her behavior.  Unlike in a Title VII claim, there are no affirmative defenses available under M.G.L. c. 151B under any set of circumstances for supervisor harassment.  See College-Town, Div. of Interco v. MCAD, 400 Mass. 156, 508 N.E.2d 587, 591-94 (1987).  See also Blockel v. J.C. Penny Co., 337 F.3d 17, 28 n.3 (1st Cir. 2003).

It is hard to imagine how Mr. Erali's female supervisor's conduct could be construed as anything other than "because of sex." In particular the environment was one in which his female boss attempted to kiss Mr. Erali. (SODF ¶ 29.) On one occasion his female boss came up from behind Mr. Erali and in the presence of his fiancée threw her arms around him. (SODF ¶ 36.) Later that same day, his female boss then left the workplace and came back dressed like Mr. Erali's fiancée, wearing shorts and a tank top. (SODF ¶ 37.) At another time, Mr. Erali and Ms. Daly happened to be alone together in the break room and his then fiancée now wife, Aleesha Watson, came to visit him, his female boss feigned that she and Mr. Erali were involved in sexual activity. (SODF ¶ 38.) On Mr. Erali's timecards that were by the time clock Ms. Daly wrote "Mikey" rather than the way in which Tom Forest usually wrote Mr. Erali's name, "Mike Erali." On one occasion his female boss wrote "Li'l Tike" on his timecard. (SODF ¶ 45.)

Ms. Daly also made a number of sexualized comments to and about Mr. Erali. She told Mr. Erali and a co-worker that she gives blow jobs to "get what she wants" and in this particular instance that she would give blow jobs in exchange for loam. (SODF ¶¶ 31, 32.) Ms. Daly said things to Mr. Erali about his working with his shirt off that made him so uncomfortable he stopped doing so. (SODF ¶ 41.) Other comments include when she said to Ms. Watson that she, Ms. Daly, had Mr. Erali all day and that Ms. Watson, has him all night and that all he does is sleep for Ms. Watson. (SODF ¶ 40.)[4] Ms. Daly also told Ms. Watson I have him working on his knees, following that with something to the effect of – "you know what I mean – on his

---

[4] Statements to third parties such as those heard by Mr. Erali's wife (then his fiancée) are admissible non-hearsay admissions of a party. Noviello v. City of Boston, 398 F.3d 76, 84-85 (2005). Those comments were also related to Mr. Erali and are admissible on that basis as well because they are offered not for the truth but for their effect on the listener, Mr. Erali and thus contributed to the hostile environment in that way.

knees." (SODF ¶ 43.) Ms. Daly also stated to Ms. Watson that Mr. Erali could come live with her. (SODF ¶ 44.)

Other comments and conduct directed toward others in the workplace contributed to the sexually hostile environment. For example, Ms. Daly wore a watch on her belt which she hung in the front of her and if a male worker asked her what time it was, she would lift up her shirt, push out her pelvis and say "you tell me." (SODF ¶ 42.)[5] She also regularly hugged and kissed several of her employees – all of whom were male. (SODF ¶ 28.)

In addition to all the innuendo and sexualized comments and conduct, Ms. Daly engaged in what amounted to stalking behavior, unremittingly calling Mr. Erali on non-work times for non-work reasons. This claim is not denied by the defendant and they present no evidence to the contrary. Rather, it attempts to argue that it was because Mr. Erali was late or absent from work and his lack of an answering machine caused Ms. Daly's incessant calling. This claim is unsupported by the record.

What the evidence shows is that Mr. Erali's female boss called him at his home, his mother's home, his wife's mother's home and his father's business. (SODF ¶¶ 46-60.) She regularly called him starting at 6:30 a.m., a half hour before he was required to be at work, she repeatedly called him after work was done for the day, she called him on weekends and often on Sunday mornings. (SODF ¶¶ 46-60.) She called him from the work phone, her personal cell phone and from her home phone. (SODF ¶¶ 46-60.) She called him 50 – 60 times over five months of working together. (SODF ¶¶ 47, 51.) In addition, the day before Mr. Erali was forced to resign, on that day alone she called him 20 times. (SODF ¶ 59.)

---

[5] Statements to third parties do not create a hearsay problem and are not being offered for the truth but to show that they were spoken and contributed to the hostile environment. Noviello, 398 F.3d at 84-85.

The phone calls became so menacing that Mr. Erali, Ms. Watson and his housemate increasingly did not answer many of Ms. Daly's phone calls that came during non-work hours. (SODF ¶ 50.) Both Mr. Erali and Ms. Watson had previously asked Ms. Daly not to call during non-work calls for non-work reasons but the calls did not stop. ( SODF¶¶ 55, 66.)  Without answering the calls they knew the calls were coming from Ms. Daly because Mr. Erali, his mother and his fiancée's mother all had Caller I.D. on their home phones.  (SODF ¶¶ 51, 57.)

Of those calls that were answered, only one was even arguably work related. The others were, personal or flirtatious and often intrusive.  For example, Ms. Daly called to speak with Mr. Erali and when Ms. Watson told her that he was unavailable, she asked Ms. Watson to give Mr. Erali the message that because he built her a fire that day at work, it did not snow, implying perhaps that he was taking care of her or she might just have been calling to hear his voice. (SODF ¶ 50.)  Another example was at a time when Ms. Daly spoke with Mr. Erali she inquired about his relationship with his fiancée.  (SODF ¶ 60.)  On another occasion when Ms. Watson asked Ms. Daly to cease the phone calls unless they were work related, Ms. Daly laughed at her and then hung up. (SODF ¶¶ 55-56.)

This case is not like Hoseman v. Technical Materials, Inc., 554 F. Supp. 659, 666 (D.R.I. 1982), cited by Defendant.  In contrast to the two week daily phone calling in that case, until the last day before Mr. Erali left work, Ms. Daly called Mr. Erali at least 50 to 60 times relentlessly throughout the entire five or so months that they worked together.  (SODF ¶¶ 47, 51.)  Ms. Daly also called Mr. Erali an additional twenty times one day alone -- the day before he was forced to resign.  On other days she often called two or three times a day including those days when he was at home because he called in sick to work. (SODF ¶¶ 48, 50, 51.)

Defendant asserts that what amounted to 80 telephone calls, almost all of which were on non-work time and all but one that they can point to were non-work related, were a business necessity.  Mr. Erali was a physical laborer who whacked weeds and dug graves.  If Mr. Erali was going to be out sick he called in to his supervisor so that they could get coverage if needed by a part-time employee whose job duties and skills were the same as were Mr. Erali's.  (SODF ¶¶ 10,13,15, 16.) There has been no evidence that the job was one which included duties of an emergency or urgent nature. There was little or no business necessity to call Mr. Erali when he was not on work time, particularly if he were home sick, after the work day was done and on weekends.  On the contrary, the evidence shows that these phone calls were not work related and made at times when his female boss simply should not have been calling.

The record contains considerable evidence that based on the totality of the circumstances including sexual comments and conduct in the workplace, her degrading and sexualized comments to Mr. Erali's fiancée and her obsessive personal phone calling, Mr. Erali's female supervisor's behavior toward Mr. Erali was because of his sex and summary judgment should be denied.

**2.     Mr. Erali's female supervisor's comments and conduct was sufficiently frequent and severe so as to alter the conditions of his employment and create a hostile work environment.**

A work environment is "abusive" or hostile when the harassment reaches a qualitative level that is "sufficiently severe or pervasive [so as] to alter the conditions of the victim's employment." Meritor, 477 U.S. at 67. The Supreme Court has set forth a non-exclusive list of factors to consider when evaluating a workplace environment, consisting of "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance. Harris, 510 U.S. at 23. However, the Court cautioned that no single one of these factors is necessarily required. Id.

A showing of sexually charged behavior is often not necessary to the proof that a work environment was sufficiently hostile or abusive to an employee of the opposite gender to amount to discrimination on the basis of sex. See O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001) (noting that "sex-based harassment that is not overtly sexual is nonetheless actionable under Title VII"); Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 905 (1st Cir. 1988) (stating that male employees' verbal attacks directed at female employees that were not sexual in nature but were "anti-female" could be found to contribute to hostile work environment); see also Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) ("[H]arassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex."). As noted by the First Circuit in O'Rourke, "incidents of nonsexual conduct--such as work sabotage, exclusion, denial of support, and humiliation--can in context contribute to a hostile work environment." O'Rourke, 235 F.3d at 730.

What is essential is proof that the work environment was so hostile or abusive because of conduct based on sex, that the terms or conditions of the plaintiff's employment were altered.  For this there is no "mathematically precise test." Harris, 510 U.S. at 22. In order to decide whether conduct rises to the requisite level, "the trier of fact must determine the existence of sexual harassment in light of the record as a whole and the totality of [the] circumstances." Meritor, 477 U.S. at 69.  The focus of this inquiry, therefore, is "the nature of the environment itself." Perry v. Ethan Allen,

Inc., 115 F.3d 143, 150 (2d Cir. 1997).  In assessing the importance of taking into

account the entire employment picture, the Sixth Circuit has emphasized that:

> The totality-of-circumstances test must be construed to mean that even
> where individual instances of sexual harassment do not on their own
> create a hostile environment, the accumulated effect of such incidents
> may result in a Title VII violation. This totality-of-circumstances examination
> should be viewed as the most basic tenet of the hostile-work-environment
> cause of action.

Williams v. General Motors Corp., 187 F.3d 553, 563 (6th Cir. 1999).

In the present case, the defendant does not appear to dispute that the

existence of a hostile work environment is determined by consideration of the totality

of the circumstances. However, it then proceeds to try to separate Mr. Erali's factual

allegations regarding offensive treatment, disregards much of the offensive conduct

and then argues why the offensive treatment amounts to "isolated incidents" and is

insufficiently pervasive to justify a finding in his favor. The court in O'Rourke

cautioned against just such a 'divide-and-conquer' approach:

> Courts should avoid disaggregating a hostile work environment claim, dividing
> conduct into instances of sexually oriented conduct and instances of unequal
> treatment, then discounting the latter category of conduct. Such an approach
> defies the Meritor Court's directive to consider the totality of circumstances in
> each case and "robs the incidents of their cumulative effect."

O"Rourke, 235 F.2d at 730 (citation omitted).

However much the defendant may attempt to ignore incidents and diminish the

significance of Mr. Erali's female supervisor's actions, the factual record in this case

viewed in its totality reflects that he endured a hostile work environment based on

sex.  As set forth on pages 7-10 above, there were numerous incidents in the

workplace that form the basis of a sexually hostile work environment.  The factual

rendition set forth above clearly supports a conclusion that the harassing conduct of

Mr. Erali's female supervisor arises to the qualitative level of severity and

pervasiveness required to meet the standard articulated by the Supreme Court in the Meritor, Harris and Faragher line of cases.

The defendant tries to temper the hostility of the environment caused by Mr. Erali's female supervisor. To do so it asserts that Mr. Erali voluntarily spent time alone with Ms. Daly, shared personal information with her and invited her to his apartment. These claims are unsupported by the evidence. If Mr. Erali ever worked alone with Ms. Daly it was not by choice. Mr. Erali had no control over his schedule. If he were assigned to work alone with Ms. Daly he had to do so or face consequences of insubordination. (SODF ¶ 116.) Mr. Erali never shared personal information with Ms. Daly unless he needed to do so because it related to work or missing time at work. If she knows any personal information it is because she would overhear Mr. Erali speaking with Mr. Forest or Mr. Doucette while at work. (SODF ¶ 115.) Mr. Erali never invited Ms. Daly to his apartment. Mr. Erali and Ms. Watson moved while Ms. Daly and Mr. Erali worked together. Ms. Daly insisted and invited herself over claiming to want to see Mr. Erali's new apartment. At the time, Mr. Erali felt he had no choice but to allow her to come over because she was his boss. (SODF ¶¶ 113, 114.)

The totality of Mr. Erali's female supervisor's actions in the workplace and particularly toward Mr. Erali reflects targeted, focused, stalking-type behavior. There can be little question that a reasonable jury could find that he was subjected to a hostile work environment and summary judgment should be denied. See Hernandez-Loring v. Universidad Metropolitana, 233 F.3d 49 (1st Cir. 2000) (evidence of two specific incidents of harassment in the context of an ongoing pattern of conduct sufficient to survive summary judgment in hostile work environment claim).

**3.    A reasonable person in Mr. Erali's position would have found the environment he encountered at work to be hostile and abusive, and he himself found it to be hostile and abusive.**

In order to support a hostile work environment claim under the fifth factor articulated by the First Circuit in O'Rourke, a plaintiff must establish that the working environment was both subjectively and objectively hostile. O'Rourke, 235 F.3d at 728. To establish an objectively hostile environment, one must show that a "reasonable person in the plaintiff's position, considering all the circumstances" would find the environment hostile.  Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 118 S. Ct. 998, 1003, 140 L. Ed. 2d 201 (1998) (citation and internal quotation omitted); See also, Muzzy v. Cahillane Motors, Inc., 434 Mass. 409 (2001). The 'objectively hostile' standard closely resembles the analysis undertaken under the fourth O'Rourke factor discussed above.  Thus, in discussing whether conduct could reasonably be perceived to be objectively hostile, the Supreme Court has instructed that "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662 (1998) (citation omitted). The evidence demonstrates that Mr. Erali's female supervisor's conduct surpasses this threshold by a considerable margin.

There is substantial testimony by Mr. Erali's employer that much of the conduct Mr. Erali complained of is objectively hostile.  At his deposition, Dan Kimball, the then Chairman of the Cemetery Department, and one of the individuals charged by the employer to administer the sexual harassment policy, testified that a single physical touching or a single inappropriate comment in the workplace that makes a person uncomfortable may each be sufficient under the town's sexual harassment

14

policy to rise to the level of sexual harassment to require immediate disciplinary action. (SODF ¶ 79.)  Mr. Kimball testified that under the Town's sexual harassment policy, an embrace or hug was sufficient to constitute sexual harassment if it makes one feel uncomfortable.  (SODF ¶ 86.)

Mr. Kimball was also asked at his deposition generally about the "blow job" comment that Mr. Erali contends was made by Ms. Daly.  Mr. Kimball testified that that comment alone is sexually harassing under the policy if it makes the individual hearing it feel uncomfortable. (SODF ¶ 80.) When asked about whether when someone at work inquires about another employee's personal life was sexually harassing Mr. Kimball testified that he thought it could be so under the Town policy. (SODF ¶ 85.)  According to Mr. Kimball, repeated non-work related calls at home from one employee to another if unwanted could also independently be sexually harassing under the policy.  (SODF ¶ 87.) What better barometer is there for determining what might be objectively hostile under the policy than such determination by Mr. Kimball who is responsible for administering that policy?

Ms. Daly herself testified that the "blow job" statement alone could constitute sexual harassment.  (SODF ¶ 81.)  She similarly testified that, depending on the frequency and the time of day that they are made, non-work related telephone calls to a coworker's home could also constitute sexual harassment. (SODF ¶ 82.)  Ms. Daly testified about her own experience and that she believed that three or four comments made to her by the Town Administrator, one about her legs, one about going on a date, and either one or two more comments she did not recall, constituted sexual harassment. (SODF ¶ 83.)[6]

---

[6] Interestingly, those comments were made to Ms. Daly by the **same person** named on the Town's sexual harassment policy as charged with addressing and remediating sexual harassment for the Town demonstrating the ineffectiveness of the Town's anti-harassment policy.  (SODF ¶ 84.)

Nor can there be any dispute that Mr. Erali subjectively perceived the environment fostered by his female supervisor at the Cemetery Department to be hostile.  The Court should look at whether a "reasonable person in the plaintiff's position, considering all the circumstances" would find the environment hostile.  <u>Oncale</u>, 118 S. Ct. at 1003.  Mr. Erali attained only an eighth grade education.  Ms. Daly herself acknowledged that Mr. Erali appeared to her to be uneducated, young and impressionable.   (SODF ¶ 22.)  The subject component of the reasonable person standard takes into account that conduct may be perceived as sexually harassing to certain people and not others and will still be actionable harassment.

There is no dispute that Mr. Erali perceived his workplace and Ms. Daly's behavior toward him as rising to the level of sexual harassment.  Mr. Erali reported more than once that the various offensive incidents including the repeated, ongoing and incessant phone calling made him uncomfortable. (SODF ¶¶ 63, 69, 71, 72.)  Mr. Erali poignantly explained at his deposition that the environment made him feel uncomfortable, humiliated, disgraced and like less of a man.  He testified, "It was embarrassing, the whole thing.  I didn't like it.  It made me feel, I felt stupid, you know, to talk about it even to this day," and that he has "been trying to block it out of my head because I don't want to remember it."  (SODF ¶ 110.)

**4.    The Defendant cannot prove that it exercised reasonable care to prevent and correct any sexually harassing behavior and that Mr. Erali unreasonably failed to take advantage of preventative or corrective opportunities and it is liable for the conduct of Mr. Erali's female supervisor.**

Where a plaintiff claims that an adverse employment action resulting from a hostile work environment is a constructive termination, an affirmative defense to liability may be available in Title VII cases even where, as here, the plaintiff alleges harassment at the hands of his supervisor. <u>Burlington Industries, Inc. v. Ellerth</u>, 524

16

U.S. 742 (1998); Faragher, 524 U.S. at 775; see also Pennsylvania State Police v. Suders, 542 U.S. 129 (2004).  Naturally, the burden rests squarely on the defendant to prove that the defense by a preponderance of the evidence. Suders, 542 U.S. at 129 accord Ellerth, 524 U.S. at 765; Faragher, 524 U.S., at 807.  This court need look no further than the defendant's own admissions to find that the defendant did not exercise reasonable care to prevent and correct any sexually harassing behavior in response to Mr. Erali's repeated complaints about his female supervisor.

The evidence shows that Mr. Erali took advantage of corrective preventative opportunities.  He complained to management on a number of occasions about sexual harassment by his female supervisor.  Mr. Erali spoke with Mr. Forest about the harassment by Ms. Daly on three occasions, the first time shortly after Ms. Daly began as Mr. Erali's supervisor.  (SODF ¶¶ 61, 62, 64.)[7]  Each time Mr. Erali complained, he reported the various offensive incidents including the repeated, ongoing and incessant phone calls that were not work related and not on work time and that Ms. Daly's behavior made him uncomfortable. (SODF ¶ 63.)

Mr. Forest grossly mishandled the situation of Mr. Erali's complaints of harassment.  Mr. Forest failed to tell anyone else from the town, including Mr. Kimball, that Mr. Erali had complained to him about Ms. Daly.  However, Mr. Kimball expected that he would have done so. (SODF ¶¶ 74 - 76.) When Mr. Erali first complained to him, Mr. Forest said that he would speak with Ms. Daly.  However, he also required Mr. Erali to personally confront his harasser about her behavior.  Mr. Erali told him that this made him uncomfortable but Mr. Forest nonetheless required

---

[7] The defendant does not dispute that Mr. Forest was someone to whom Mr. Erali could complain in compliance with the Town's sexual harassment policy.  In fact, Mr. Forest had been employed by the Cemetery Department since 1966, in a management role for the majority of that time.  (SODF ¶ 19.) Moreover, as someone responsible for administering the sexual harassment policy Mr. Kimball acknowledged that a complaint to a supervisor such as Mr. Forest is appropriate under the policy. (SODF ¶ 74, 75, 88.)

Mr. Erali to confront her.  (SODF ¶ 65.)  Mr. Forest did so despite his view that it was

embarrassing and uncomfortable for a man to talk about being sexually harassed by

his female boss.  (SODF ¶ 111.)  Unsurprisingly, the behavior did not stop – rather it

escalated with increased phone calling and repeated sexualized behavior.  (SODF ¶¶

55, 57.)

When Mr. Erali next complained about Ms. Daly's ongoing harassing behavior

to Mr. Forest, (SODF ¶ 68), Mr. Forest again wanted Mr. Erali to confront Ms. Daly.

(SODF ¶ 72.)   Mr. Erali told him that she made him so uncomfortable that he

requested that he not be made to confront her again.    (SODF ¶ 72.)  Mr. Forest

agreed and said that he would speak with her again himself.  Mr. Forest never

followed up with Mr. Erali to see if Ms. Daly continued to harass him.  (SODF ¶ 73.)

When the harassment did not stop, on April 21, 2003, Mr. Erali went for a third

time to Mr. Forest, this time with his fiancée.   (SODF ¶ 90.)  The harassment had

now escalated to a point where Ms. Daly and a new Cemetery Department employee

were saying derogatory and offensive things about Mr. Erali and his family in the

presence of Mr. Erali's co-workers.   (SODF ¶ 89.)  This was the first time Mr. Forest

told Mr. Erali that he and Ms. Watson should speak with Mr. Kimball.  (SODF ¶ 90.)

Ms. Watson spoke with Mr. Kimball first, around midday, and told him about the

derogatory statements made by Ms. Daly about their family, about the incessant

phone calling by Ms. Daly during non-work hours, and about sexual or suggestive

comments and incidents directed at Mr. Erali.  Mr. Kimball asked her to have Mr. Erali

call him, which Mr. Erali did.  (SODF ¶¶ 93, 94.)  When Mr. Erali spoke with Mr.

Kimball and told him about the sexual comments, the unwanted touchings and the

phone calls by Ms. Daly and how he was afraid to be alone with her due to her

behavior.  He told him about his multiple meetings with Tom Forest, and how despite

18

repeated complaints, Mr. Forest had been unable to effectively address the harassment.   (SODF ¶¶ 93, 95.)

Remarkably, Mr. Kimball's response was equally irresponsible and ineffective as was Mr. Forest's.  Mr. Kimball responded as did Mr. Forest and insisted that Mr. Erali must confront Ms. Daly about his allegations.   Mr. Kimball required him to do so, despite his view that this is not an effective way to handle the situation. (SODF ¶¶ 96, 98.)   Mr. Erali made clear to Mr. Kimball that this approach made him uncomfortable and that he had already been required to do so by Mr. Forest -- and that when he had been required to speak with Ms. Daly, the harassment worsened. (SODF ¶¶ 97, 99.)

Despite Mr. Erali's pleas, Mr. Kimball made Mr. Erali confront his harassing female supervisor.  Mr. Kimball said that he would be there and Mr. Erali had to speak with her (SODF ¶ 98.)  He gave Mr. Erali the option of having a phone meeting with her which Mr. Erali chose, thinking it might be less uncomfortable than confronting her in person. (SODF ¶ 101.)  Mr. Erali and Mr. Kimball chose a time for the phone meeting.  Mr. Kimball the called Mr. Erali on the following day at the appointed time.

What Mr. Kimball did next was truly astonishing.  When he called Mr. Erali he immediately put Ms. Daly on the telephone and made Mr. Erali make all his complaints directly to her.  (SODF ¶ 104.)  Needless to say, this methodology was wholly ineffective and further victimizing.  Almost immediately, Ms. Daly cut Mr. Erali off, raised her voice and told him that he needed to decide right then and there, "not a week from today, not two days from now but right now" if he wanted to continue working there and she essentially hung up on him. (SODF ¶ 106.)  Mr. Kimball admits

that he was not really paying attention to the phone call between Mr. Erali and Ms. Daly and that he never contacted Mr. Erali again.  (SODF ¶ 108.)[8]

The facts compel the conclusion that despite Mr. Erali's ongoing complaints to management, Mr. Erali's employer utterly failed in its duty to prevent and correct harassing behavior and summary judgment should be denied.

### B.    MR. ERALI WAS CONSTRUCTIVELY DISCHARGED FROM HIS EMPLOYMENT WITH THE TOWN OF ORANGE, AND THE DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON THIS ISSUE.

It is well settled in this Circuit that to establish a claim of constructive discharge, the evidence must support a finding that the employee's working conditions had become so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign. Greenberg v. Union Camp Corp., 48 F.3d 22, 27 (1st Cir. 1995). Courts are instructed to examine the totality of the circumstances in assessing whether a claim based on a constructive discharge theory will lie. Courts in this Circuit and elsewhere look to the cumulative effect of an employer's actions and inaction in determining whether working conditions were so difficult or unpleasant so as to warrant a finding of constructive discharge.  Ramos v. Davis & Geck, Inc., 167 F.3d 727, 731-32 (1st Cir. 1999); See also, Calhoun v. Acme Cleveland Corp., 798 F.2d 559, 562-63 (1st Cir. 1986); Chertkova v. Connecticut General Life Insurance Co., 92 F.3d 81, 90 (2d Cir. 1996); Levendos v. Stern Entertainment, Inc., 860 F.2d 1227, 1230-31 (3d Cir. 1988).

The facts in this case viewed in their totality clearly support a conclusion that Mr. Erali's decision to forsake his job rather than submit to further indignities by his female supervisor, especially in light of the fact that he had every reason to believe

---

[8] Mr. Kimball acknowledges that he failed to conduct an appropriate investigation.  (SODF ¶ 109.)  Neither did Ms. Daly nor Mr. Forest receive any discipline as a result of Mr. Erali's allegations or their failure to address them.  (SODF ¶ 114.)

that her actions were sanctioned by the Town and that the conditions would not change, was entirely reasonable. As discussed extensively at pages 6 -16 above, Mr. Erali was repeatedly subjected to demeaning sexualized and stalking behavior by his supervisor.   And, as explained at pages 16 to 20 above, the Town botched any feeble attempt to address Mr. Erali's claims of harassment.

What the evidence shows in sum is that when Mr. Erali complained to Mr. Forest he made Mr. Erali confront his harasser.  Mr. Forest failed to respond effectively to repeated complaints by Mr. Erali and the harassment escalated.  On April 21, when Mr. Kimball became aware of the complaints, the harassment escalated further and Ms. Daly obsessively stalked Mr. Erali calling him at his home, his mother's home, his mother-in-law's home and his father's business.  Mr. Kimball's only response was to also require Mr. Erali to speak directly to and to confront his harasser immediately after this series of events.  Ms. Daly then gave him an ultimatum and told him he had to decide right away if he was going to continue working at his job. Mr. Erali could only conclude from these problematic facts that the conditions which had escalated would only worsen, nothing was going to be done to address the situation going forward and the hostile conditions with the victimizing response together contributed to a working environment which became objectively intolerable.

The evidence also shows that Mr. Erali was on target to receive a significant raise and clothing allowance within a short time after he left his employment and it is reasonable to conclude that he would not have left unless he was forced to do so under the circumstances.  (SODF ¶ 24.)

21

The evidence supports the conclusion based on the totality of the circumstances summarized above that Mr. Erali was constructively discharged from his employment, and the defendant is not entitled to summary judgment on this issue.

### C.    MR. ERALI WAS RETALIATED AGAINST BY HIS EMPLOYER FOR HIS COMPLAINTS OF SEXUAL HARASSMENT, AND THE DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON THIS ISSUE.

The record evidence demonstrates that Mr. Erali faced illegal retaliation as a result of his complaints of sexual harassment by his supervisor.  The parties agree on the legal standard that applies for claims of retaliation.  The town concedes that Mr. Erali engaged in protected activity but challenges the remaining elements, that he was subjected to an adverse action and causation.  See Noviello, 398 F.3d at 91.[9]

The defendant also concedes that either a hostile environment or a constructive discharge is each an independent adverse action.  See Noviello, 398 F.3d at 92-94.[10]  Its only argument is that Mr. Erali has failed to prove that he was subjected to a hostile environment or was constructively terminated.  Considerable evidence extensively discussed above support both that Mr. Erali was subjected to a sexually hostile work environment and that the environment rose to a level to cause a constructive termination.

The record is strong that the adverse actions taken against the plaintiff, including an escalating pattern of harassment against Mr. Erali and his constructive termination, are causally linked to the defendant's retaliatory motive.

[9] It is worthy of note that for the defendant to concede that Mr. Erali engaged in protected activity it concedes that he did make complaints of sexual harassment to his employer.  M.G.L. c. 151B requires that for an actionable claim of retaliation a claimant must assert rights protected under M.G.L. c. 151B, the anti-discrimination statue.

[10] Although the Supreme Judicial Court has not addressed whether a hostile work environment is an adverse action for purposes of M.G.L. c. 151B, after a lengthy analysis, the First Circuit in Noviello concluded that it would.  Noviello, 398 F. 3d 90-91.

The defendant does not dispute that Mr. Erali complained to Mr. Forest on three occasions. Mr. Erali's complaints and the escalating harassment and ultimate constructive termination were all in close temporal proximity. "When harassment follows hard on the heels of protected activity, the timing often is **strongly** suggestive of retaliation." Noviello, 398 F.3d at 86. (Emphasis added.)

What the evidence shows is that within about four (4) months after Mr. Erali's first complaint to his employer, the harassment he endured at the hands of his supervisor became so intolerable that he was forced to resign. The first time he complained to Mr. Forest was shortly after Ms. Daly began in the Cemetery Department but sometime after December 2002. (SODF ¶ 64.) Mr. Erali's next complaint of harassment came sometime between the first complaint and April 21, 2003, when Mr. Erali complained to Mr. Forest on a third occasion. (SODF ¶¶ 68, 90.) Ms. Daly was made aware of each time of Mr. Erali's complaints. (SODF ¶¶ 67, 72.) Mr. Erali and Ms. Watson both complained to Mr. Kimball on April 21, 2003. (SODF ¶¶ 90-98.) Ms. Daly was also aware of this complaint. The evidence shows that in no more than four short months the retaliatory harassment had grown so unrelenting that the temporal nexus alone is sufficient to support a strong inference of causation and survive summary judgment.

Other evidence supports that the escalating harassment was causally related to the employer's retaliatory animus. Mr. Erali went to work on April 21, 2003, and before even punching in heard from a co-worker that the harassment had escalated and Ms. Daly and a co-worker were speaking in a derogatory manner about him and his family and that Ms. Daly had called Ms. Watson a bitch. When Mr. Erali confronted Ms. Daly in the presence of Dan Kimball she gave him an ultimatum

telling him that he had to decide right away if he was going to continue to work there. The stakes had risen and Ms. Daly's harassment had hit a new level.

Around midday on April 21, 2003, Ms. Watson spoke with Mr. Kimball for the first time about this and all the previous incidents, including the phone calling. Mr. Erali spoke with Mr. Kimball for the first time later that evening and complained of Ms. Daly's sexually harassing behavior targeted toward him. (SODF ¶¶ 92, 93.) That same day Ms. Daly engaged in a stalking campaign, calling Mr. Erali 20 times alone on that day at his home, his mother's home, his fiancée's mother's home and his father's business. (SODF ¶¶ 51, 91.)

There is evidence that the Town's reaction was itself retaliatory. First Mr. Forest and now Mr. Kimball had made Mr. Erali confront his harasser in the face of his complaints. Mr. Kimball made him do so despite knowing that this was not an appropriate way in which to deal with harassment. (SODF ¶¶ 90-98.)

The harassment itself escalated which supports retaliatory motive. Ms. Daly felt free not only to harass Mr. Erali but to say derogatory things about Mr. Erali's children and call his fiancée a bitch. (SODF ¶ 89.) Perhaps she was emboldened by her belief that the harassment, including the phone calling did not have to stop because she was his boss. (SODF ¶ 66.) In fact, after Mr. Erali complained about Ms. Daly, the phone calls became more frequent in number. (SODF ¶ 55.)

Finally, the defendant does not offer any non-retaliatory reason for its actions. It attempts, however, to raise the specter that Mr. Erali left his job because he was reprimanded for walking off the job on April 22. This claim is a pretext. Truly amazing is that in support of this claim the defendant relies on another employee's time card that was not even punched on the day that it claims that Mr. Erali walked off work. (SODF ¶ 45.) This is in contrast to Mr. Erali's clear testimony that he was told by

24

Dan Kimball that he was not to come in to work on April 22 and that he was to

confront Ms. Daly by phone on that day. This claim is also belied by the fact that on

April 22, Mr. Kimball called Mr. Erali at home because Mr. Kimball himself had

arranged to do so the previous evening. (SODF ¶¶ 98-102.)

Finally, it makes no sense that Mr. Erali would leave the first job he ever had

with a chance of advancement. (SODF ¶¶ 2-7.) The evidence shows that before Ms.

Daly became his supervisor, Mr. Erali loved his job. For the first time he had been

promoted and benefits with his employment. He was in line for a significant raise and

a clothing allowance benefit in the upcoming months after his forced resignation.

(SODF ¶ 24.) Mr. Erali simply would not walk off work unless he was compelled to

do so. The evidence supports that Mr. Erali suffered retaliation as a result of his

complaints of harassment by his supervisor and summary judgment should be

denied.

### III.    CONCLUSION

Mr. Erali provides strong evidence in support of each of his claims. At a

minimum, genuine disputes of material facts abound on all of the plaintiff's claims and

the defendant's affirmative defenses and summary judgment should be denied.

Dated: March 17, 2006

PLAINTIFF MICHAEL ERALI II
By his attorney,


/s/ Suzanne Garrow
Suzanne Garrow BBO# 636548
sgarrow@comcast.net
Heisler, Feldman, McCormick
    & Garrow, P.C.
1145 Main Street, Suite 508
Springfield, MA  01103
Ph. (413) 788-7988
Fax (413) 788-7996

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF).

              ___/s/ Suzanne Garrow_____
              Suzanne Garrow