UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL ERALI II

Plaintiff,

v.

TOWN OF ORANGE,
Defendant.

DOCKET NO. 3:04-cv-30241-MAP

**PLAINTIFF'S STATEMENT OF FACTS PURSUANT TO LOCAL RULE 56.1 AS TO WHICH THERE EXISTS A GENUINE DISPUTE TO BE TRIED**

***Background***

1. Michael Erali grew up in Orange, Massachusetts. (Defendant's Exhibit B, Deposition of Daniel Kimball, hereafter "Kimball Dep." page 95.)[1]

2. He attained only an eighth grade education, (Defendant's Exhibit A, Deposition of Michael Erali, hereafter "Erali Dep." page 5), and when Mr. Erali dropped out of school he went to work for the Town of Orange as a laborer at the town's Recycling and Transfer station, earning approximately 7.50 per hour. (Erali Dep. page 5-7.)

3. Mr. Erali held the job at the Recycling and Transfer station for three to four years and had a second and, at times, a third laborer job. (Erali Dep. page 7-8.)

4. Mr. Erali eventually left work with the Town of Orange looking for better pay and worked at various private employers for several years. (Erali Dep. page 8-11.)

[1] The defendant has filed a hard copy of all the deposition transcripts in this case as an attachment to its Statement of Facts, Docket No. 17. In respect for the environment and rather than duplicating efforts, the plaintiff will cite to the defendant's exhibits A-F when citing to a page in a deposition transcript and will refer to each as "Defendants' Exhibit ____ when first cited in its Statement of Disputed Facts. Plaintiff's other exhibits referred to herein are attached to the Affidavit of Suzanne Garrow filed on this day with the clerk's office.

5. Although he was a hard worker, in none of those positions did he ever receive any sort of promotion or benefits. (Erali Dep. page 7-11.)

6. Looking to help support his fiancée Aleesha Watson[2] and their two children Mr. Erali sought and was re-hired by the Town of Orange. (Erali Dep. page 4-5, 11.)

7. He was first rehired by the Town as a temporary seasonal laborer with the Cemetery Department earning around $10 per hour and was later promoted to a full-time laborer less than a year after his hire. (Erali Dep. page 12-13.)

8. Mr. Erali's supervisor at the time he was hired was Tom Forest. (Forest Dep. page 66-67.)

9. As a laborer in the Cemetery Department, Mr. Erali worked Monday through Friday from 7 a.m. to 3:30 p.m., except on the very rare occasion that he was required to dig a grave at another time. (Erali Dep. page 25.)

10. The full and part time laborer positions in the Cemetery Department were essentially the same job including the number of hours worked in busier times and generally varied only in that part-timers or seasonal employees were ineligible for any town employee benefits. (Kimball Dep. page 63; Defendant's Exhibit C, Deposition of Evelyn Daly, hereafter "Daly Dep." page 43, 48.)

11. As a laborer in the Cemetery Department Mr. Erali dug graves, cut grass, weed whacked, raked and did other routine grounds maintenance at the seven cemeteries located in the Town of Orange. (Erali Dep. page 17.)

12. During the entire time he was a laborer Mr. Erali was required to keep the cemetery office and the main cemetery shop clean, including the bathrooms and

[2] For ease of reference Mr. Erali's fiancée will be referred to as Aleesha Watson, her name at the time. They have since married and she has changed her name to Aleesha Erali.

break room. (Defendant's Exhibit D, Deposition of Thomas Forest, hereafter "Forest Dep." page 42.)

13. Mr. Erali was a very hard worker, and despite all the defendant's post hoc rationalizations for a number of its actions, Mr. Erali was written up only once in his entire tenure for his lateness by Mr. Forest, was never written up by Ms. Daly, and never failed to come to work without calling in to apprise his supervisor that he would not be coming to work. (Forest Dep. page 67; Daly. Dep. page 124-25; Erali Dep. page 105.)

14. Each morning Mr. Erali and his coworkers arrived at the main cemetery shop and within 15 minutes of their arrival were dispatched to perform the day's duties. (Erali Dep. page 19.)

15. Generally, a full-time laborer works with a part-time or seasonal employee on each particular job or project. (Erali Dep. page 19.)

16. During the time in which Mr. Erali was employed by the Town of Orange Cemetery Department Shane Doucette, Gerard Donadio, Mark Ward and Todd Fellows were all at various times employed as laborers in the Cemetery Department. (Erali Dep. page 15-16.)

17. At all times during which Mr. Erali worked at the Cemetery Department Mr. Forest had some supervisory role over the laborers in that department. (Erali Dep. page 21-22; Kimball Dep. page 33; Daly Dep. 40.)

18. At some point in the Fall of 2002, Evelyn Daly was hired as to become Mr. Erali's supervisor. (Erali Dep. page 21-22.)

19. As was explained to Mr. Erali, she was to replace Mr. Forest who had been with the Cemetery Department since 1966 when he retired. (Forest Dep. page 7; Erali Dep. page 21-22; Kimball Dep. page 33.)

20. Mr. Erali understood that there was a 6-month period of time when there was to be an overlap between Mr. Forest and Ms. Daly acting as supervisors in some capacity in the Cemetery Department. (Erali Dep. 21-22; Kimball Dep. 33.)

21. Ms. Daly was not originally from Orange. (Daly Dep. page 20.)

22. Ms. Daly perceived Mr. Erali as uneducated, young and impressionable. (Daly Dep. page 45-46.)

23. Prior to Ms. Daly starting work at the Cemetery Department, Mr. Erali loved his job. (Erali Dep. page 116; Defendant's Exhibit F, Deposition of Aleesha Watson Erali, hereafter "Watson Dep." page 56-57.)

24. Mr. Forest told Mr. Erali that Mr. Erali was to receive a $2-3 raise per hour and a $600 clothing allowance in the near future, after his probation period as a full-time employee expired and because Mr. Erali had passed the test to receive his hoister's license, which would have been shortly after he was constructively terminated. (Erali Dep. page 14.)

***<u>Incidents of Sexual and Gender Harassment by Ms. Daly Toward Mr. Erali When she Became His Supervisor</u>***

25. When Mr. Forest was Mr. Erali's only supervisor the atmosphere in the Cemetery Department was good and professional and the department itself appeared well-run. (Erali Dep. page 20-21.)

26. In contrast to the professional atmosphere at the Cemetery Department when Mr. Forest was the only supervisor, once Ms. Daly started working as a supervisor the atmosphere changed. (Erali Dep. page 22.)

27. The atmosphere became tense because of the way Ms. Daly behaved. (Erali Dep. page 23.)

28. In particular, Ms. Daly hugged and kissed several of the employees – who, at the time, other than she were all male. (Erali Dep. page 22.)

29. Ms. Daly attempted to kiss Mr. Erali but he did not allow her to get close enough to do so. (Erali Dep. page 22.)

30. Instead she put her arm around him on at least one occasion. (Erali Dep. page 61; Kimball Dep. page 98.)

31. After Ms. Daly became Mr. Erali's supervisor the workplace was infected with her comments and conduct that was sexual in nature including one comment made during work by Ms. Daly in front of Mr. Erali and a co-worker was that she would give blow jobs to "get what she wants." (Erali Dep. page 47.)

32. In this particular instance Ms. Daly said that she would give blow jobs in exchange for loam. (Erali Dep. page 46-47.)

33. Mr. Erali did not understand if Ms. Daly was talking about giving him a blow job, or the men at the Town Highway Department. (Erali Dep. page 46-47.)

34. In either case, he was disgusted by the comment. (Erali Dep. page 47.)

35. Mr. Erali also recalled an incident when Ms. Watson came to visit him at work wearing a tank top and shorts. (Erali Dep. page 61-62.)

36. Ms. Daly came up from behind him and in the presence of Ms. Watson threw her arms around him which embarrassed him and made him feel uncomfortable (Erali Dep. page 61-62; Kimball Dep. page 98.)

37. Ms. Daly then left the workplace and came back dressed like Ms. Watson, in shorts and a tank top which he and his coworker, Mr. Doucette found very strange. (Erali Dep. page 61-62.)

38. At another time when Mr. Erali and Ms. Daly were alone together in the break room and Ms. Watson came to visit him, Ms. Daly feigned that she and Mr. Erali were involved in sexual activity which made Mr. Erali uncomfortable. (Erali Dep. page 62-63.)

39. Another comment was made by Ms. Daly to Ms. Watson in the presence of their roommate, Abigail Caless, and Mr. Erali's children. (Erali Dep. page 76.)

40. Ms. Daly stated that she had Mr. Erali all day and that she, Ms. Watson, has him all night and that all he does is sleep for you. (Erali Dep. page 65; Kimball Dep. page 67-68; Watson Dep. page 43.)

41. Ms. Daly said things to Mr. Erali about his working with his shirt off that made him so uncomfortable he stopped doing so. (Watson Dep. page 38.)

42. Ms. Daly wore a watch on her belt which she hung in the front of her and if her male coworkers asked her what time it was, she'd lift up her shirt, push out her pelvis and say "you tell me." (Watson Dep. page 39.)

43. Ms. Daly stated to Ms. Watson that I have him working on his knees, following that with something to the effect of --you know what I mean – on his knees, which Ms. Watson related to Mr. Erali. (Erali Dep. page 65, 77; Kimball Dep. 67-page 68; Watson Dep. 42-43.)

44. Ms. Daly also stated to Ms. Watson that Mr. Erali could come live with her, which Ms. Watson related to Mr. Erali. (Watson Dep. page 64; Kimball Dep. 72-73.)

45. Ms. Daly occasionally wrote the nickname "Mikey" on Mr. Erali's timecards, rather than the way in which Tom Forest write his name, "Mike Erali" and on one occasion near the end of his tenure wrote "Li'l Tike" on his timecard. (Time cards attached to the Affidavit of Suzanne Garrow, hereafter Garrow Aff. at Exhibit 1; Daly Dep. page 118-19.)

46. Ms. Daly also incessantly called Mr. Erali's home at times beginning at around six-thirty in the morning, often a full half hour before his work day was to begin. (Erali Dep. page 24,26; Watson Dep. page 22.)

47. Ms. Daly called Mr. Erali at home, or at his mother's home at least 50 to 60 times during the five or so months that they worked together. (Erali Dep. page 28.)

48. Ms. Daly would often call two or three times a day, including on weekend days and on Sunday mornings. (Watson Dep. page 19.)

49. Ms. Daly also called Mr. Erali at home two to three times on days when Mr. Erali called in sick asking to speak with him for no apparent or identified work-related reason and, after a while, Ms Watson started to tell Ms. Daly that Mr. Erali was sleeping. (Watson Dep. page 22-23.)

50. The phone calls got so menacing that Mr. Erali, Ms. Watson and their roommate Ms. Caless stopped answering the phone calls. (Erali Dep. page 28, 42; Watson Dep. page 20.)

51. They nonetheless knew that it was Ms. Daly calling because their phone has Caller I.D which on at least 20 occasions displayed Daly's personal cell phone number, on another 20 occasions displayed Ms. Daly's home phone number; on the other occasions it displayed the Town of Orange Cemetery Department phone number. (Erali Dep. page 28-29; Watson Dep. page 20.)

52. If Ms. Daly called after 4:30 p.m. the call would be from her home or cell number, which occurred at least two or three times per week. (Pictures of caller ID, Garrow Aff. at Exhibit 2; Watson Dep. page 24-25.)

53. Ms. Watson occasionally answered the phone when Ms. Daly called and despite the incessant calling and comments by Ms. Daly, Ms. Watson did not

want to be rude to her because Ms. Daly was Mr. Erali's boss. (Watson Dep. page 44; Erali Dep. page 42.)

54. Once Ms. Daly called and asked to speak with Mr. Erali, when Ms. Watson told Ms. Daly that he was unavailable, Ms. Daly asked that she give Mr. Erali a message to the effect of "tell Mikey that because he built me a fire today, it didn't snow." (Watson Dep. page 21.)

55. It got to the point that Mr. Erali would try to avoid the phone calls from Ms. Daly as they were not work related and when Ms. Daly called Ms. Watson repeatedly asked Ms. Daly to cease the phone calls unless they were work related but after she and Mr. Erali complained the phone calls got more frequent in number. (Erali Dep. page 41,43; Watson Dep. page 32, 49.)

56. On at least one occasion, this request by Ms. Watson was met with Ms. Daly laughing at her and than hanging up on her and the phone calls did not cease. (Erali Dep. page 42.)

57. In addition to the other 60 or so calls, on one day alone Mr. Erali estimated that he received about 20 calls from Ms. Daly from her personal cell phone, from her home phone and from the Town of Orange Cemetery Department; the calls were made to his home, to his mother's home and to his father's business. (Erali Dep. at 29-32, 36; Garrow Aff. at Exhibit 2.)

58. This was not first time Ms. Daly had called his mother's house or Ms. Watson's mother's house over the 5 months she was Mr. Erali's supervisor. (Erali Dep. page 34-35, 45.)

59. The day with the 20 phone calls by Ms. Daly to Mr. Erali was April 21, 2003, the day before he Erali left work. (Erali Dep. page 29-30, 34.)

60. When Ms. Daly spoke with Mr. Erali on April 21, 2003, she spoke with him about his fiancée and their relationship and not for any work-related reason. (Erali Dep. page 30, 34.)

***Mr. Erali's Repeated Reports of the Unwelcome, Unwanted Sexual Behavior***

61. Mr. Erali understood from Mr. Forest that if he ever had a problem in the workplace he should speak with him. (Erali Dep. page 74.)

62. Mr. Erali reported the various incidents and the excessive phone calling to Mr. Forest on three separate occasions. (Erali Dep. page 50-51; Forest Dep. page 28.)

63. Each time Mr. Erali reported the various offensive incidents to Mr. Forest he also reported that Ms. Daly's behavior made him uncomfortable. (Erali Dep. page 51; Forest Dep. page 41, 60-61.)

64. The first time Mr. Erali reported Ms. Daly's behavior to Mr. Forest was at a private meeting sometime after December of 2003, not long after Ms. Daly began. (Erali Dep. page 52-53.)

65. Mr. Forest responded by saying that he would speak with Ms. Daly but that Mr. Erali must also confront Ms. Daly about his complaints regarding her behavior. (Erali Dep. page 52; Forest Dep. page 29, 51-52.)

66. When Mr. Erali spoke with Ms. Daly about the phone calls she told him that they would not stop because she was the boss – and they didn't. (Erali Dep. page 54-55.)

67. Mr. Forest spoke with Ms. Daly about her behavior toward Mr. Erali. (Forest Dep. page 52.)

68. Mr. Erali complained about Ms. Daly's behavior to Mr. Forest on another occasion when Mr. Forest came by the Holtshire Cemetery where Mr. Erali was working raking pine needles. (Forest Dep. page 55-56.)

69. He reported that the continued personal phone calling and Ms. Daly's ongoing behavior made him uncomfortable. (Forest Dep. page 60; Watson Dep. page 38.)

70. Mr. Forest shared with Mr. Erali that the way in which Ms. Daly hugged and kissed Mr. Forest at work was causing Mr. Forest problems at home with his wife. (Forest Dep. page 55-56, 60)

71. At that meeting they talked about how Mr. Erali was uncomfortable being around Ms. Daly and with the atmosphere at work; Mr. Erali was upset and Mr. Forest tried to calm him. (Forest Dep. page 62.)

72. Mr. Forest said that he would speak to Ms. Daly and wanted Mr. Erali to go with him to speak with her but Mr. Erali told him that she made him uncomfortable and asked that he not be made to confront her again to which Mr. Forest agreed. (Erali Dep. page 54; Forest Dep. page 63.)

73. Mr. Forest never followed up with Mr. Erali to see if Ms. Daly's behavior had changed, and because her behavior had continued and escalated Mr. Erali asked Mr. Forest if he could have another meeting with him. (Erali Dep. page 54.)

74. At no time did Mr. Forest tell his superiors, including the Chairman and members of the Cemetery Commission, nor anyone else affiliated with the Town that Mr. Erali had complained to him about Ms. Daly. (Kimball Dep. page 39, 59.)

75. This was so despite the Chairman Dan Kimball's responsibility for administering the sexual harassment policy. (Kimball Dep. page 44-45.)

76. Mr. Kimball expected that any complaint of sexual harassment reported to a supervisor would be reported him. (Kimball Dep. page 126.)

77. Mr. Kimball had about two hours of sexual harassment training in 1990 and about a half hour of such training in 1999. (Kimball Dep. page 21-23.)

78. No such training was provided to him by the Town of Orange or associated with his position as Chairman or Commissioner of the Cemetery Department. (Kimball Dep. page 21-23.)

79. According to Mr. Kimball, a report of a physical touching or inappropriate comment or comments in the workplace that make a person uncomfortable may each be independently sufficient under the town's sexual harassment policy to require immediate disciplinary action. (Kimball Dep. page 48-49.)

80. Mr. Kimball testified at his deposition about a comment where a co-worker says, "I was able to get loam from the Highway Department because I gave the guys there a blow job," alone is sexually harassing under the policy if it made the individual hearing it feel uncomfortable. (Kimball Dep. page 50-51.)

81. Ms. Daly herself testified that a single a statement about giving blow jobs at work could constitute sexual harassment. (Daly Dep. page 82.)

82. Ms. Daly similarly stated that, depending on the frequency and the time of day that they are made, non-work related telephone calls to a coworker's home could constitute sexual harassment. (Daly Dep. page 108.)

83. Ms. Daly testified that three or four comments made to her by the Town Administrator, one about her legs, one about going on a date, and the other one or two she did not recall, constituted sexual harassment. (Daly Dep. page 82-84.)

84. Those comments were made to Ms. Daly by Rick Kwaitowski, the Town Administrator who is the person named on the Town's sexual harassment policy as charged with addressing and remediating sexual harassment for the Town. (Sexual Harassment Policy, attached to Garrow Aff. at Exhibit 3; Daly Dep. page 82-84.)

85. When asked about whether when someone at work inquires about another employee's personal life was sexually harassing Mr. Kimball testified that he thought it could be. (Kimball Dep. page 52.)

86. When asked what sort of physical touching was sexually harassing under the Town's policy Mr. Kimball stated that an embrace or hug was sufficient if it makes one feel uncomfortable. (Kimball Dep. page 51.)

87. According to Mr. Kimball repeated non-work related calls from one employee to another if unwanted could be sexually harassing under the policy. (Kimball Dep. page 53.)

88. An employee can complain of harassment to a Commissioner or to his boss and be in compliance with the Towns policy. (Kimball Dep. page 53.)

***Treatment of Mr. Erali During His Final Days with the Town of Orange***

89. On April 21, 2003, Mr. Erali showed up for work and left without punching in because he heard from a coworker that on the previous workday Ms. Daly and a new employee at the Cemetery department were speaking in a derogatory manner about him and his family which included Ms. Daly calling Ms. Watson a bitch. (Erali Dep. page 56.-57.)

90. Mr. Erali left work and went to Mr. Forest a third time about the harassment and about this other issue and for the first time Mr. Forest referred Mr. Erali to Dan Kimball, the Chairman of the Cemetery Department. (Erali Dep. page 59.)

91. Ms. Daly proceeded to call Mr. Erali at home about 20 times. (Erali Dep. page 29-30, 34.)

92. Mr. Erali spoke with Mr. Kimball on that day and told him about the sexual comments, the unwanted touchings and the incessant phone calling by Ms. Daly, and about his meetings with Tom Forest, how he was directed to speak with him by Mr. Forest because Mr. Forest was not able to effectively address these incidents. Mr. Erali never told Mr. Kimball that he had any problem with the fact the Ms. Daly was becoming his boss. (Erali Dep. page 65; Kimball Dep. page 82.)

93. Ms. Watson also spoke to Mr. Kimball on that day and, in fact, she spoke with him first around midday; when they spoke Mr. Kimball told Ms. Watson to have Mr. Erali call him, which Mr. Erali did. (Erali Dep. page 65; Kimball Dep. page 93; Watson Dep. 60.)

94. Ms. Watson told Mr. Kimball about the derogatory statements made by Ms. Daly about their family, about the incessant phone calling by Evelyn Daly not during work hours, and about the sexual or suggestive comments made to Mr. Erali by Ms. Daly. (Erali Dep. page 65; Kimball Dep. page 67-68, 72-73; Watson Dep. page 43, 46.)

95. Mr. Erali told Mr. Kimball that he was afraid to be alone with Ms. Daly, that she acted too personal with him, that she had said things to him that he was rude and made him uncomfortable and that he wanted her not to touch or hug him. (Kimball Dep. page 76-77.)

96. Mr. Kimball's response to Mr. Erali was that Mr. Erali was required to confront Ms. Daly about his allegations yet, according to Mr. Kimball, this was not an appropriate way to handle the situation. (Erali Dep. page 66; Kimball Dep. page 87.)

97. Mr. Erali replied that he had already been required to do so by Mr. Forest. (Erali Dep. page 66.)

98. Mr. Kimball said that he would be there and that Mr. Erali was required to speak with her again. (Erali Dep. page 66.)

99. Mr. Erali made clear to Mr. Kimball that he was uncomfortable having to confront her. (Erali Dep. page 66.)

100. Mr. Kimball offered to set up a telephone meeting with Mr. Erali, Ms. Daly and himself. (Erali Dep. page 66.)

101. Although Mr. Erali continued to feel uncomfortable with the idea of confronting Ms. Daly, because he was required to do so he opted for the telephone meeting thinking that might make him feel less uncomfortable. (Erali Dep. page 66, 68.)

102. Mr. Kimball told Mr. Erali to stay at home the next morning, April 22, 2003, and that he was going to call Mr. Erali at his apartment at 9:30 a.m. (Erali Dep. page 66, 68; Watson Dep. page 37.)

103. According to Mr. Kimball, he and Mr. Forest spoke with Ms. Daly before speaking with Mr. Erali on the phone and Mr. Kimball sought Mr. Forest's input on this personnel issue in his department. (Kimball Dep. page 79-80.)

104. At nine-thirty the following morning Mr. Erali got a call from Mr. Kimball, the extent of the conversation between Mr. Erali and Mr. Kimball was for Mr. Kimball to say hello and ask if Mr. Erali was ready to speak to Ms. Daly about all the complaints he had made about Ms. Daly to Mr. Kimball. Mr. Kimball did not pay attention to the conversation. (Erali Dep. page 68- 69; Kimball Dep. 85.)

105. Mr. Erali tried to speak with Ms. Daly because he was required to do so when she cut him off and raised her voice to him stating that he and Mr. Doucette were defiant and used "shovels as rakes and you break them." (Erali Dep. page 70.)

106. Ms. Daly told him that he needed to decide right then, "not a week from today, not two days from now but right now" if he wanted to continue working there. (Erali Dep. page 70.)

107. Based on this experience with Mr. Kimball, Ms. Daly, and his prior experiences with Mr. Forest, it was clear to Mr. Erali that despite his ongoing complaints, nothing was going to change, the harassment would continue and so he went to the office and turned in his keys. (Erali Dep. page 70-71.)

108. Mr. Kimball never contacted him again. (Erali Dep. page 71; Kimball Dep. page 101.)

109. Although never in his capacity as Chairman or Commissioner of the Town of Orange Cemetery Department, Mr. Kimball had conducted investigations regarding "minor" personnel issues in which he conducted extensive investigations which including interviewing employees in "private" to elicit "personal" information. (Kimball Dep. page 25-27, 29-30.)

110. Mr. Erali explained that the environment made him feel uncomfortable, humiliated, disgraced and like less of a man. He testified, "It was embarrassing, the whole thing. I didn't like it. It made me feel, I felt stupid, you know, to talk about it even to this day." And that he has "been trying to block it out of my head because I don't want to remember it." (Erali Dep. page 76, 111.)

111. From Mr. Forest's perspective this was a reasonable reaction for a man under these circumstances. (Forest Dep. page 100.)

112. Neither Ms. Daly nor Mr. Forest received any discipline as a result of Mr. Erali's allegations or their failure to address them. (Kimball Dep. 105.)

113. Mr. Erali never invited Ms. Daly to his home but when he and his fiancée were moving into a new apartment and Ms. Daly invited herself over claiming that she wanted to see the new apartment. (Affidavit of Michael Erali II at ¶¶ 1-2, attached to Garrow Aff. at Exhibit 4.)

114. He did not want her to come to his apartment but felt he had no choice because she was his boss. (Erali Aff. ¶ 3 attached to Garrow Aff. at Exhibit 3.)

115. Mr. Erali only shared personal information with Ms. Daly if it pertained to work, i.e. to inform her why he might be late or absent from work and if she knew any personal information about me it is because she overheard it because she used to listen in to my conversations with Tom Forest or Shane Doucette. (Erali Aff. ¶¶ 4-5 attached to Garrow Aff. at Exhibit 3.)

116. If Mr. Erali ever worked alone with Ms. Daly it is because she scheduled it and he was required to do so or walk off the job; he had had no control over my schedule or with whom he worked. (Erali Aff. ¶ 6 attached to Garrow Aff. at Exhibit 3.)

Dated: March 17, 2006

PLAINTIFF MICHAEL ERALI II
By his attorney,

/s/ Suzanne Garrow

Suzanne Garrow BBO# 636548
sgarrow@comcast.net
Heisler, Feldman, McCormick
& Garrow, P.C.
1145 Main Street, Suite 508
Springfield, MA 01103
Ph. (413) 788-7988
Fax (413) 788-7996

CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF).

/s/ Suzanne Garrow
Suzanne Garrow